

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:DEL/MWG/ADR    *271 Cadman Plaza East*
F. #2020R00637    *Brooklyn, New York 11201*

November 8, 2023

<u>By ECF</u>

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    <u>United States v. Joseph Bellantoni</u>
               <u>Criminal Docket No. 21-466 (S-1) (HG)</u>

Dear Judge Gonzalez:

      The government respectfully submits this letter in advance of the sentencing of defendant Joseph Bellantoni, which is currently scheduled for November 16, 2023. On July 13, 2023, Bellantoni pleaded guilty to health care fraud conspiracy in connection with his participation in a scheme to defraud the health fund (the "Health Fund") of a Queens, New York labor union (the "Labor Union"), with multiple members of the Colombo organized crime family of La Cosa Nostra. Bellantoni's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 4 to 10 months' imprisonment. For the reasons discussed below, the government respectfully recommends a Guidelines sentence of 10 months' imprisonment.

I.    <u>Offense Conduct</u>

    A.    <u>Relevant Background</u>

      This case arose from an investigation initiated in July 2020 by the Federal Bureau of Investigation ("FBI") and other law enforcement agencies into the extortion of a senior official of the Labor Union by members of the Colombo crime family. <u>Id.</u> ¶ 4. At the time, the Labor Union, whose members are primarily involved in the construction industry, had approximately 2,000 members in New York, New Jersey, Pennsylvania and elsewhere. <u>Id.</u> ¶ 28. The Labor Union was affiliated with several benefit plans for its members and their families, including the Health Fund, an employee welfare benefit plan and health care benefit program which provided benefits for medical, dental, vision, and pharmacy. <u>Id.</u> ¶¶ 29-30.

      The PSR details the breadth and nature of the Colombo crime family's extortion scheme against the Labor Union's senior official, who is referred to in the Superseding Indictment as John Doe #1. The extortion began in 2001 and principally entailed defendant and Colombo

crime family captain Vincent Ricciardo collecting $2,600 monthly from John Doe #1's salary, a sum which Ricciardo sometimes referred to as a "pension" for himself from the Labor Union. PSR ¶¶ 31-32. In 2020, members and associates of the Colombo crime family approached John Doe #1 in a grocery store, appeared at his home while his family was present, visited his Labor Union workplace, forced him to attend meetings with members of the crime family, and repeatedly and frequently called and texted him in connection with the extortion. PSR ¶¶ 33-43. Between 2001 and 2020, John Doe #1 paid more than $600,000 to the members of the Colombo crime family in connection with the extortion. PSR ¶ 43. Bank records obtained from financial institutions since 2010 corroborate these payments. Id.

In 2020, members of the Colombo crime family expanded the demands on John Doe #1 and sought to (1) force the Labor Union's management to make decisions that benefitted the Colombo crime family, including the hiring and employment of a co-conspirator and ultimately a cooperating witness ("Co-Conspirator #1") as the assistant administrator to the Health Fund; (2) manipulate the selection of the Health Fund's vendors in order to have the Health Fund contract with entities and individuals associated with the Colombo crime family; and (3) divert more than $10,000 per month from the Health Fund's assets to the defendants and their co-conspirators. PSR ¶¶ 52-57. In December 2020, as Vincent Ricciardo and other members of the Colombo crime family demanded, John Doe #1 hired Co-Conspirator #1 as an assistant administrator and agreed to pay him $144,000 per year, in addition to other payments to Ricciardo. PSR ¶ 56. In early 2021, after Co-Conspirator #1 was installed in his new position at the Health Fund, Vincent Ricciardo directed Co-Conspirator #1 to obtain all vendor contracts on file at the Health Fund as well as information and paperwork on the Fund's trustee meetings, vendors and contracts. PSR ¶ 57.

The investigation revealed that over the course of the next several months, Vincent Ricciardo and the members of the Colombo crime family sought to use their control over the Labor Union to replace the Health Fund's vendors and Union's legal counsel with entities beholden to the Colombo crime family and its associates. Those entities would then pay a monthly fee, or "kickback," to the crime family. As explained below, for at least eight months in 2021, Bellantoni assisted members of the Colombo crime family by identifying and recruiting multiple vendors who agreed to provide kickbacks to the Colombo crime family, which would be disguised as payments to and from Bellantoni's marketing company.

B. Bellantoni's Involvement in the Money Laundering Scheme

In January 2021, soon after Colombo crime family captain and disgraced Union leader Vincent Ricciardo forced the Health Fund to hire Co-Conspirator #1 as a highly paid consultant, Ricciardo received and reviewed internal, confidential documents belonging to the Labor Union and the Health Fund. Ricciardo explained, in a call intercepted by a judicially authorized wiretap on January 22, 2021, to Co-Conspirator #1 that they needed to send copies of these documents to "Albert," Ricciardo's long-time friend and the defendant Albert Alimena, and directed Co-Conspirator #1, "Alright you gotta go over that with uh, Joey," or defendant Joseph Bellantoni.

Bellantoni was a representative of the Building Industry Fund, a tax-exempt organization based in Holbrook, New York. PSR ¶ 21. In that role, Bellantoni was affiliated with

2

multiple, related ERISA[1] and non-ERISA plans that claim to provide training, healthcare, and retirement benefits to union members in the electrical industry. Id. Bellantoni also report to co-conspirators that he ran a marketing company, which contracted with vendors providing health services to Unions and their related health funds.

Bellantoni and his Relative had a close relationship with Vincent Ricciardo. As Ricciardo explained in a conversation that was consensually recorded on April 22, 2021, "I know [the Relative] a long, long, long time." He said, they first met when the Relative worked with the Teamsters Union, and they became friends and would eat lunch together every day. Bellantoni and Ricciardo had a similarly close relationship. Throughout the investigation in consensually recorded communications, Bellantoni often referred to Ricciardo as "Uncle Vinny."

Bellantoni also had close ties with co-defendant Alimena. Alimena's Dickinson Group acted as the third-party administrator for Bellantoni's Building Industry Fund. As Ricciardo explained in a consensually recorded conversation on May 5, 2021, "Dickinson Group used to be above [the Relative's] office at Howard Beach and the Teamsters all [UI] in there. That's how far back we go with the Dickinson Group." Bellantoni and Alimena attended labor conferences together, including one conference in the Bahamas in May 2021, where they had dinner together with their spouses and discussed, among other things, their involvement in the charged schemes.

On March 10, 2021, Ricciardo and the Co-Conspirator #1 met with Bellantoni and the Relative at a Nassau County diner to discuss the Labor Union and the Health Fund. Around this time, according to Co-Conspirator #1 who was present at these meetings, Bellantoni told Vincent Ricciardo that if Ricciardo selected a pharmacy benefit manager aligned with Bellantoni, he and the Relative would funnel $10,000 monthly payment to Ricciardo and the Colombo crime family — an amount that could increase depending on the volume of pharmacy claims. PSR ¶¶ 58, 83. The following month, on April 20, 2021, in another consensually recorded conversation, Vincent Ricciardo told Bellantoni that Alimena had promised he could provide $10,000 per month to the Colombo crime family if his company (the Dickinson Group) was selected as the third-party administration for the Health Fund. PSR ¶ 84.

Over the next several months, Vincent Ricciardo and Co-Conspirator #1 met with Bellantoni numerous times concerning their scheme to infiltrate and divert money from the Health Fund to the Colombo crime family. By April 2021, Bellantoni had identified two vendors who had agreed to bid for the contract and if selected, make monthly payments to the Colombo crime family. Bellantoni explained one vendor assessed claims for pharmacy benefits and the other for vision and dental benefits. PSR ¶ 58.

In a meeting at a Suffolk County diner on April 22, 2021, which was consensually recorded, Bellantoni informed Ricciardo and Co-Conspirator #1 that Bellantoni's selected vendors

---

[1] The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for most voluntarily established retirement and health plans in private industry to provide protection for individuals in these plans.

3

had not yet received a request for proposal from the Health Fund — the first step in the contracting process.  PSR ¶ 85.  A transcript of the relevant portion of the conversation is below:

| | | |
|---|---|---|
| J. BELLANTONI: | | By the way, nobody has sent us the information yet. |
| CC#1: | | What, the pharmaceuticals [vendor] didn't get any information yet? |
| J. BELLANTONI: | | Nope. And neither has [the vendor for dental and vision]. |
| CC#1: | | What a minute. |
| V. RICCIARDO: | | So they didn't get anything. |
| J. BELLANTONI: | | Nope. |
| V. RICCIARDO: | | Can you call again? |
| J. BELLANTONI: | | I will make it happen again [UI]. |

At that meeting, Vincent Ricciardo and Bellantoni also discussed the ouster of another consultant to the Health Fund whom they believed was frustrating the scheme to infiltrate the Union. Bellantoni directed Ricciardo to "make his life miserable."

| | | |
|---|---|---|
| V. RICCIARDO: | | [Consultant's first name] [is] going anyway, one way or the other. He's going. |
| CC#1: | | Yeah, you got to be prepared if he doesn't go. |
| V. RICCIARDO: | | Well you know, he lives in a bad way. |
| J. BELLANTONI: | | You can just make his fucking life miserable. |
| CC#1: | | Listen, if he plays ball, he may play ball because he wants his family to keep the money they're making.  They're making plenty. |
| J. BELLANTONI: | | Fuck him, he's got to go.  Make his life miserable. |

In this meeting, Vincent Ricciardo also informed Bellantoni about his meeting with "Brooklyn," Ricciardo's shorthand for the administration of the Colombo crime family, and a past meeting at the boss's house, attended by the underboss and the consigliere, the second and third most powerful members of the Colombo crime family.  Ricciardo laments the changes within organized crime, saying, "I don't know what is going on with this life . . . . You think a guy is a rat . . . . you whack him.  Can you fire him, what are youse nuts?  What's going on in this world?  I am not built for this shit."  Bellantoni's direction to make the senior official "miserable" came with his full knowledge that he was dealing with members of the Colombo crime family who were capable of enacting real violence and economic harm.

4

The following week, on April 28, 2021, at a diner in Nassau County, another meeting which was consensually recorded, Co-Conspirator #1 informed Bellantoni that Alimena had received a request for proposal from the Health Fund, and the vendors under Bellantoni's control would receive the bid paperwork by mid-May. PSR ¶ 86. Co-Conspirator #1 asked Bellantoni about the "accounting," or kickbacks, to the crime family, and Bellantoni explained the payments would made each month. PSR ¶ 86.

| | |
|---|---|
| CC#1: | And then, how do you do the accounting with these guys, on a quarterly basis? |
| J. BELLANTONI: | Uh, TPA normally takes care of that. |
| CC#1: | Or monthly? The TPA takes care of your end? |
| J. BELLANTONI: | No, no, no, oh you mean? |
| CC#1: | The accounting? |
| Individual: | Ha, how do you straighten it out, quarterly? |
| J. BELLANTONI: | Monthly. |
| CC#1: | Oh really, on a monthly basis, that's not a bad dealing. |
| J. BELLANTONI: | Everything comes in nice. |
| J. BELLANTONI: | Figure everything is one month behind. |

Then, on May 5, 2021, at another meeting to discuss the selected vendors, which was recorded, Bellantoni told Ricciardo he was meeting with the vendor for vision and dental benefits the next morning and that Bellantoni was "going to grab ahold of him, tell him what he is going to do and how he is going to do it." PSR ¶ 86. Bellantoni separately confirmed the pharmacy benefits vendor was preparing a bid for the Health Fund. Approximately one month later, on June 4, 2021, the pharmacy benefits vendor selected by Bellantoni submitted a bid to the Health Fund. PSR ¶ 92.

In addition to connecting the Colombo crime family with vendors willing to make illegal payments, Bellantoni also began assisting Vincent Ricciardo in hiring a lawyer associated with Bellantoni (the "Lawyer") to represent the Health Fund. PSR ¶ 89. Vincent Ricciardo believed the Health Fund's existing attorney was loyal to the administration of the Labor Union, whom Ricciardo sought to fire.

Bellantoni arranged a meeting with the Lawyer and Co-Conspirator #1 on June 7, 2021, at a steakhouse in Nassau County. PSR ¶ 93. Before the Lawyer arrived, Bellantoni explained to Co-Conspirator #1 what the Lawyer already knew about the Colombo crime family's involvement, in a conversation that was consensually recorded:

You know [the Lawyer] understands that you guys are coming in. When I say you guys, you, coming in to make sure that everything is working properly and that everything is coming over. We told her that it's a little bit of a hostile takeover. . . . But that's about it. There is nothing, Brooklyn politics anything along those lines.

When asked whether the Lawyer knew about "the origins of the union . . . the people that were involved and still involved," Bellantoni clarified again that the Lawyer doesn't know about "Brooklyn politics" and that he didn't talk about "Brooklyn politics." By "Brooklyn politics," Bellantoni meant the involvement of the Colombo crime family in the ongoing extortion. Bellantoni and Co-Conspirator #1 then attended the meeting with the Lawyer, where they discussed the Lawyer's engagement with the Labor Union and the Health Fund. PSR ¶ 93.

At the meeting outside the presence of the Lawyer, Bellantoni also discussed the vendor-selection process. PSR ¶ 93. Before the meeting took place, Bellantoni directed Co-Conspirator #1 to leave his phone in the car and asked how much the vendor for dental and vision benefits should bid for the Health Fund contract in order to ensure the vendor was selected. PSR ¶ 93. Later after the Lawyer left the meeting, Bellantoni explained in more detail how the vendors would divert money from the Health Fund, which conversation was consensually recorded:

| | |
|---|---|
| CC#1: | How are they going to do this? That's the question I have. They are going to do it as a commission, commission back? |
| J. BELLANTONI: | What happens is this. He is going to pay, I have a contract with [vendor's first name] already, with my marketing company. So what [vendor's first name] does is if it's a dollar a head two dollars a head that vision has gotta do, he'll add that on- |
| CC#1: | Right. |
| J. BELLANTONI: | He goes, then he'll pay me, the commission, to give to you, so we all make a piece out of it. |
| CC#1: | All of them are going to do that, PBM [pharmacy benefits manager]? |
| J. BELLANTONI: | Yes. |
| CC#1: | All of that. |
| J. BELLANTONI: | You know just to be above board. We all make a piece of the deal and its perfect, and no check goes to you directly or your company or anything else from him so there is no conflict of interest. And I'm the one that's giving you a check, for marketing or whatever else we are doing, the [UI]. |
| CC#1: | Yeah, alright. |

6

PSR ¶ 93. As Bellantoni explained, the vendors for vision and dental benefits and pharmacy benefits would inflate the cost of each prescription by $1 or $2, and provide that money to Bellantoni's marketing company, who would take a portion for arranging the deal, and then would provide a check to Co-Conspirator #1 purportedly for "marketing services." PSR ¶ 93.

On June 14, 2021, Co-Conspirator #1, Vincent Ricciardo, and Bellantoni attended a charity golf outing in Nassau County. At the event, Bellantoni introduced Co-Conspirator #1 to the vendor for dental and vision benefits that Bellantoni had pre-selected for the Colombo crime family. Before Co-Conspirator #1 met the vendor, Bellantoni advised Co-Conspirator #1 that the vendor knew he would be paying the Colombo crime family, in a conversation that was consensually recorded:

| | |
|---|---|
| CC#1: | Before we start talking to him what does he know what does [UI] not know. |
| J. BELLANTONI: | Let's put it this way, the only thing he is going to know is that you are a consultant. |
| CC#1: | Right. |
| J. BELLANTONI: | And that you are looking to bring him in. |
| CC#1: | Right. |
| J. BELLANTONI: | That's the only thing he needs to know from you. |
| CC#1: | From me, but what does he actually know? |
| J. BELLANTONI: | He knows everything. |
| CC#1: | Everything? |
| J. BELLANTONI: | Between you and me. |
| CC#1: | He knows about us… but does he know about… |
| J. BELLANTONI: | Yeah, yeah. |
| CC#1: | Who is behind us. |
| J. BELLANTONI: | He knows Uncle Vinny, he knows everyone. His father . . . |
| CC#1: | Well I know. |
| J. BELLANTONI: | His father [UI] golf with them. Oh yeah. |
| CC#1: | His father is. |

7

| | | |
|---|---|---|
| J. BELLANTONI: | | Well his father passed but yeah. |
| CC#1: | | His father had a relationship with . . . |
| J. BELLANTONI: | | Yeah very good. |
| CC#1: | | So he knows how this gets paid and everything [UI] |
| J. BELLANTONI: | | The biggest thing is that he knows that he pays me and I take care of what I got to take care of. So that way it doesn't go directly to any of youse and I take whatever burden is there. That way he is comfortable, you are comfortable. |

Bellantoni told Co-Conspirator #1 that he had informed the vendor who was really behind the vendor's selection — the members of the Colombo crime family. Bellantoni would act as the middleman, so as not to implicate the vendor or the Colombos in the illegal payments.

At a meeting on August 5, 2021, with Alimena and Co-Conspirator #1, Bellantoni complained John Doe #1, a senior official at the Labor Union, was not cooperating with the scheme.

| | | |
|---|---|---|
| J. BELLANTONI: | | Cause if they're playing games over there, they're playing dangerous games. |
| CC#1: | | No, he isn't, [employee name] isn't there, I know that for a fact. |
| J. BELLANTONI: | | No, no, I know that part, but I'm just saying, if [John Doe #1's first name] is playing a game right now, he's playing a very dangerous game with all parties that's in that group right now. |

B.  Procedural History

A grand jury in this District returned an indictment against Bellantoni and others on September 8, 2021. Bellantoni was charged with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count 13), conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. § 371 (Count 14); health care fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count 15); attempted health care fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Count 16). Bellantoni was arrested on September 14, 2021, and arraigned before the Honorable Taryn A. Merkl, United States Magistrate Judge. Bellantoni was released on pretrial conditions. On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document and contained the same counts against Bellantoni.

On July 13, 2023, Bellantoni pleaded guilty, pursuant to a plea agreement with the government, to Count Fifteen of the superseding indictment charging health care fraud conspiracy. PSR ¶ 1.

C. Guidelines Calculation

The government agrees with the Guidelines as calculated in the PSR, id. ¶¶ 178-88, with the following modifications: first, as contemplated in the PSR, the defendant's offense level should be reduced two levels under U.S.S.G. § 5K2.0 for entering into a global resolution consistent with the conditions set forth in Paragraph 14 of his plea agreement. Id. ¶ 238, and second, Bellantoni is eligible for an additional two-level reduction for zero-point offenders under U.S.S.G. § 4C1.1. Thus, Bellantoni's Guidelines are as follows:

| | |
|---|---|
| Base Offense Level (§§ 2X1.1(a), 2B1.1(a)(2)) | 6 |
| Plus: Intended Loss Exceeds $150,000 But Is Less Than $250,000 (§ 2B1.1(b)(1)(F)) | +10 |
| Less: Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Less: Global Resolution (§ 5K2.0) | -2 |
| Less: Reduction for Zero-Point Offenders (§ 4C1.1) | -2 |
| Total: | <u>9</u> |

Because the defendant is in criminal history Category I, PSR ¶ 212, the resulting Guidelines range is 4 to 10 months' imprisonment.

II. The Appropriate Sentence

A. Applicable Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. In so doing, the court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." Id. at 590.

The Supreme Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id.

(noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

    C.    Argument

For five months, Bellantoni attended regular meetings with Colombo crime family captain Vincent Ricciardo and his associates, plotting and scheming to infiltrate the Health Fund and funnel payments from the Fund to the Colombo crime family and himself. Without the efforts of law enforcement officers and Union employees who helped frustrate the scheme, Bellantoni would be lining his pockets and funding organized crime at the expense of Union members and their employers. For this conduct, the government respectfully submits that 10 months' imprisonment is appropriate in view of the serious and sustained efforts to assist the Colombo crime family in its money laundering scheme, as well as the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

    1.    Nature and Circumstances of the Offense

The serious nature of the criminal conduct here, as well as its nexus to a violent organized crime enterprise, warrants a meaningful term of imprisonment. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Bellantoni and others sought to defraud 2,000 Union members and their families by diverting money from the fund established to cover their health costs for the benefit of themselves and the Colombo crime family. In addition to suffering a financial loss, the Fund

participants would have been robbed of a competitive bidding process among qualified professionals and the selection of legitimate vendors for dental, vision and pharmacy benefits who won the contract on the strength on their proposals, not the strengthen of their connection to Bellantoni and the Colombo crime family.

Bellantoni was instrumental in the scheme to infiltrate and siphon money from the Health Fund. Bellantoni had knowledge and experience in the industry. He identified two vendors who were willing to make the illegal payments. He doggedly followed up each meeting about the information the vendors required and the process to get them selected. Bellantoni also sought to help the co-conspirators avoid detection by law enforcement by using himself as a middleman: he proposed receiving the illicit payments from the vendors, with whom he had a preexisting relationship, and then funnel the money to the Colombo crime family through his own marketing company. As Bellantoni explained in a consensually-recorded conversation on June 14, 2021, "The biggest thing is that he [the vendor] knows that he pays me and I take care of what I got to take care of. So that way it doesn't go directly to any of youse and I take whatever burden is there. That way he is comfortable, you are comfortable."

Bellantoni now argues that the vendors were not aware they were making payments to Colombo crime family. This is flatly contradicted by Bellantoni's own explanation to his co-conspirators. Indeed, Bellantoni explained on June 14 that the vendor for vision and dental "knows everything." When specifically asked if the vendor knows "who is behind us," Bellantoni said the vendor "knows Uncle Vinny, he knows everyone." More importantly, Bellantoni knew who was receiving the payments. In addition to his own profits, Bellantoni knew was helping divert money to the Colombo crime family, a pernicious criminal organization whose substantial influence in the construction industry and the New York City community more generally persists. Bellantoni had a close relationship with "Uncle Vinny," a captain in the Colombo crime family twice-convicted for labor racketeering and barred from any association with labor unions and their associated funds. Indeed, Bellantoni met Ricciardo and his associates regularly and listened to Ricciardo explain about "Brooklyn politics," meetings with the second and third most powerful members of the crime family, the penalty for being an informant, and news from "another family's boss" that one of their members may be a "rat." Bellantoni even adopted Ricciardo's term "Brooklyn politics," when explaining that he hadn't told his Lawyer about the "Brooklyn politics" involved in the Union's "hostile takeover." Bellantoni's conduct is all the more serious because it involved the enrichment of organized crime members at the expense of Union members and their families.

Bellantoni was also clearly aware of the penalties incurred for crossing members of the mafia. By mid-2021, after months of failed attempts to infiltrate the Health Fund and funnel payments to the Colombo crime family and himself, Bellantoni blamed John Doe #1 for the delay. He said that John Doe #1 "is playing a game right now, he's playing a very dangerous game <u>with all parties that's in that group right now</u>." In other words, Bellantoni recognized that John Doe #1's continued disregard for the Colombo crime family could end with dire, serious consequences.

Although Probation determined that Bellantoni appears unable to pay a fine, Bellantoni did not seek to skim money from Union members and its fund out of his own need. Bellantoni has a reported net worth of more than $1 million, and at the time of the instant offense, was the sole owner of a photography business that had an annual revenue of $476,000 (resulting

in a salary of $56,000 per year), as well as a position in a family consulting business with an annual salary of $47,000 per year. His involvement in the money-laundering scheme was borne out of greed and hubris. That attitude is further illustrated by the bravado Bellantoni displayed as he worked alongside members of the mafia. For instance, when discussing a planned interaction with a vendor, Bellantoni explained he was "going to grab ahold of him, tell him what he is going to do and how he is going to do it." Or, in another example, when Bellantoni encouraged Ricciardo to make "life miserable" for a Union consultant opposed to the Colombo's hostile takeover.

2. <u>Defendant's History and Characteristics</u>

Bellantoni's history and characteristics demonstrate that a sentence of 10 months incarceration is warranted here. Indeed, Bellantoni committed the instant offense despite a supportive and close-knit family life (PSR ¶¶ 196-98, 200); an educational history that includes a certificate from an automotive technical program and some college (PSR ¶¶ 210-11); and stable, well-paying employment (PSR ¶ 213-214). The fact that Bellantoni committed the instant offense despite all of these advantages demonstrates that Bellantoni choose to involve himself in the Colombo crime family's scheme for his own profit. The government's requested sentence sends a message to the defendant and others that that opting for "quick cash" through fraudulent means will lead to significant punitive consequences.

Bellantoni's request for a sentence of probation is also premised on the difficulty that any period of incarceration will impose on his family. This is an unfortunate reality for many defendants. All too often, a defendant's family struggles with the collateral consequences of the defendant's actions and the resulting period of incarceration. As such, while the government recognizes that the defendant's incarceration may have an adverse impact on his defendant's wife and children, this does not materially distinguish him from many or most of the other defendants sentenced in this District. In fact, by his actions, Bellantoni demonstrated his commitment not to his own family but to the Colombo crime family. In choosing to commit significant fraud, Bellantoni did not put his family first.

3. <u>Affording Deterrence and Protecting the Public</u>

A sentence of 10 months' imprisonment is also necessary to afford adequate deterrence to criminal conduct, especially those who may seek to assist organized crime. 18 U.S.C. § 3553(a)(2)(B) and (C); see e.g., <u>United States v. Davis</u>, 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010) ("Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence.").

4. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

For many of the same reasons, a ten-month term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. As explained, without law enforcement's actions, Bellantoni would have assisted in the Colombo crime family in setting up a hard-to-detect money laundering operation that would have resulted in harm to real victims.

IV. <u>Conclusion</u>

For these reasons, the government respectfully requests that the Court impose a sentence of 10 months' imprisonment, a sentence within the Guidelines range.

Respectfully submitted,

BREON PEACE<br>
United States Attorney

By:    /s/<br>
       Devon Lash<br>
       Michael W. Gibaldi<br>
       Andrew D. Reich<br>
       Assistant United States Attorneys<br>
       (718) 254-7000

cc:    Clerk of Court (HG) (by ECF)<br>
      James Froccaro, Esq. (by ECF)<br>
      United States Probation Officer Maxine Marquez (by E-Mail)